IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| _____ ) | |
| IAN WALKER and STEPHEN KRUSE, ) | |
| on behalf of themselves ) | |
| and all others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 1:07-cv-00635-TSE-TCB |
| v. ) | |
| ) | |
| S.W.I.F.T. SCRL, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**STATEMENT OF INTEREST
OF THE UNITED STATES OF AMERICA**

PETER D. KEISLER
Assistant Attorney General

CHUCK ROSENBERG
United States Attorney

CARL J. NICHOLS
Deputy Assistant Attorney General

R. JOSEPH SHER
LAUREN A. WETZLER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Ave.
Alexandria, VA. 22314

JOSEPH H. HUNT
Director, Federal Programs Branch

DOUGLAS N. LETTER
Terrorism Litigation Counsel

SANDRA M. SCHRAIBMAN
Assistant Director, Federal Programs Branch

OF COUNSEL:

ANDREA GACKI
JOHN R. COLEMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

ROBERT F. HOYT
General Counsel
U.S. Department of the Treasury

*Attorneys for the United States of America*

Pursuant to 28 U.S.C. § 517,[1] the United States of America respectfully submits this Statement of Interest in support of  S.W.I.F.T. SCRL's Motion for Partial Reconsideration of the June 12, 2007 Order entered by the United States District Court for the Northern District of Illinois ("the Chicago District Court").  As set forth below, the United States has an exceptionally strong interest in ensuring that parties who comply with lawful and duly authorized subpoenas designed to help combat terrorism — as SWIFT did here — are given the full benefits of statutory immunity provisions designed to ensure that the United States has available information crucial to protecting the national security.

## INTRODUCTION

Shortly after the terrorist attacks of September 11, 2001, the United States Department of the Treasury ("Treasury Department") instituted the Terrorist Financing Tracking Program ("TFTP"), to track funds flowing to international terrorist activities.  The TFTP is an important part of the United States' efforts to interrupt the financing for terrorists; those efforts — many of which require the gathering of information from third parties — include freezing and blocking terrorist assets; using financial information to gain insights into terrorists' activities and possible targets; and sharing information with key foreign governments to strengthen their efforts to combat terrorist financing. Acting pursuant to both the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706 — which grants broad authority to address threats to national security— and related Executive Orders, since September 11, 2001, the Treasury Department has issued various lawful administrative subpoenas to SWIFT seeking information needed to implement the TFTP.

*The New York Times* disclosed the existence of the TFTP, as well as SWIFT's compliance

---

[1] *See* 28 U.S.C. § 517 ("The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.").

with Treasury's administrative subpoenas, in a June 23, 2006 article. Although the existence of the TFTP and certain other facts as a result now have been publicly acknowledged, important details of the program remain classified.

On the same day as the *New York Times* article, plaintiff Walker (joined later by plaintiff Kruse) filed this action against SWIFT. Plaintiffs claim that SWIFT has violated the Fourth Amendment; the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.*; and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* In addition to monetary damages, and although plaintiffs have chosen not to sue the United States to enjoin the TFTP, they seek to enjoin SWIFT's compliance with Treasury's administrative subpoenas, thereby effectively enjoining the TFTP.

The United States has an exceptionally strong interest in ensuring that it has all the appropriate tools and information necessary to combat terrorism, including information that will help it locate and restrict the flow of funds to terrorists and their activities. These tools include the authority to direct the production of records, and Section 203(a)(3) of IEEPA, 50 U.S.C. § 1702(a)(3) — the statute's "safe harbor" provision — which protects from litigation persons and entities who comply with directions issued under IEEPA, including those from whom the government seeks information during a declared national emergency, thereby ensuring the maximum compliance with the government's efforts to gather such information.

The Chicago District Court's June 12, 2007 Order reflects a fundamental misconception of both the statutory safe harbor provision and plaintiffs' allegations, and by permitting this litigation to continue risks the very harms that the safe harbor was designed to prevent. The Chicago District Court erred in other highly significant respects as well, including: finding that plaintiffs had standing to pursue these claims; permitting plaintiffs' Fourth Amendment claims to survive notwithstanding

the clear holding of *United States v. Miller*, 425 U.S. 435 (1976), that there is no Fourth Amendment privacy interest in financial records held by third parties; and holding that plaintiffs had adequately alleged that SWIFT is an "agent" of a financial institution under the Right to Financial Privacy Act.

The Court should therefore grant SWIFT's Motion for Partial Reconsideration of the Chicago District Court's June 12, 2007 Order in order to preserve the TFTP, protect SWIFT from the burden of further litigation here, and minimize the likelihood that highly classified information will be threatened.  Plaintiffs' action should be dismissed.

## OVERVIEW AND LEGAL FRAMEWORK

The United States has long utilized emergency economic powers as an essential part of its foreign policy and national security activities. During much of the 20th century, the exercise of such powers was governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 40 Stat. 411 (codified as amended at 50 U.S.C. app. §§ 1-44).  As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *See* 50 App. U.S.C. § 5(b)(1); *Dames & Moore v. Regan*, 453 U.S. 654, 670 (1981) (noting that TWEA § 5(b) provides the "pertinent language of § 1702" of IEEPA, and upholding various economic sanctions taken against Iran by the United States).

TWEA granted to the President the power to administratively obtain documents, which is traditionally accomplished through the well-respected tool of administrative subpoenas.  *See* 50 U.S.C. app. § 5(b)(1).  Critically, TWEA provided a "safe harbor" from liability "for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder."  *See id.* § 5(b)(2).

**A.      The International Emergency Economic Powers Act**

In 1977, Congress amended TWEA and enacted the International Emergency Economic

Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, to delineate "the President's authority to regulate

international economic transactions during wars or national emergencies." *See* S. Rep. No. 95-466,

at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541; *Regan v. Wald*, 468 U.S. 222, 227-28

(1984).  IEEPA authorizes the President to declare a national emergency "to deal with any unusual

and extraordinary threat, which has its source in whole or substantial part outside the United States,

to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).

Like TWEA, IEEPA gives the President broad investigative powers.  *See id.* § 1702(a)(2).

These powers are necessary for the proper administration of economic sanctions:

> Section 203(a) of the bill [50 U.S.C. § 1702(a)] defines the
> international emergency economic authorities available to the
> President in the circumstances specified in section 202.  This grant of
> authorities basically parallels section 5(b) of the Trading With the
> Enemy Act. . . .  Paragraph (1)(B) authorizes the President to require
> any person to keep and furnish records necessary to enforce these
> provisions.

H.R. Rep. No. 95-459, at 15 (1977); *see also* S. Rep. No. 95-466, at 5 (1977), *reprinted in* 1977

U.S.C.C.A.N. 4540, 4543 ("Section 203(a) would grant the President emergency authority . . . to

require records to be kept or produced as necessary to the exercise of authorities under this title.").

In the economic sanctions programs relevant to this litigation, the President has delegated all of his

authorities under IEEPA to the Treasury Department, which has implemented these powers through

its Office of Foreign Assets Control ("OFAC").

At the heart of this case is the IEEPA provision that authorizes the government to require

"any person" to "keep a full record of, and to furnish under oath, in the form of reports or otherwise,

complete information relative to the [regulated] act or transaction," *see* 50 U.S.C. § 1702(a)(2), and

-4-

to demand "the production of any books of account, records, contracts, letters, memoranda, or other papers," *see id.*  And OFAC's implementing regulations issued under IEEPA state that OFAC may, *inter alia*, "require by subpoena . . . the production of all books, papers, and documents related to any matter under investigation."  *See* 31 C.F.R. § 501.602; *see also* 31 C.F.R. § 594.601.

Like TWEA, IEEPA contains a broad immunity provision designed to ensure and encourage compliance with the government's exercise of its IEEPA authority.  Section 1702(a)(3) provides that "[n]o person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, [IEEPA], or any regulation, instruction, or direction issued under [IEEPA]."  *See* 50 U.S.C. § 1702(a)(3).

### B.  September 11, 2001, and Executive Order No. 13,224

On September 11, 2001, al Qaeda agents who had entered the United States launched coordinated attacks on key strategic sites, killing approximately 3,000 people — the highest single-day death toll from foreign attacks in the Nation's history.  The President immediately declared a national emergency in view of "the continuing and immediate threat of further attacks on the United States."  *See* Proclamation 7463, "Declaration of National Emergency by Reason of Certain Terrorist Attacks," 66 Fed. Reg. 48,199 (2001).  The United States also launched a military campaign against al Qaeda, and Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11.  *See* Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001).

President Bush also issued Exec. Order No. 13,224, effective on September 24, 2001, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States."  *See* Exec.

-5-

Order No. 13,224, Preamble.  In determining that actual and threatened terrorist acts constituted "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," the President invoked the authority of, *inter alia*, IEEPA.  *See id.* The Executive Order further authorized the Secretary of the Treasury to "employ all powers granted to the President by IEEPA . . . as may be necessary to carry out the purposes" of the Executive Order, *see* Exec. Order No. 13,224, § 7, including the power to require information by administrative subpoena.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.**  Plaintiffs initially filed suit against SWIFT in the U.S. District Court for the Northern District of Illinois, seeking declaratory judgment, equitable relief, and statutory and punitive damages for injuries allegedly suffered by the named plaintiffs and others as a result of SWIFT's compliance with OFAC's administrative subpoenas.  Plaintiffs claim that SWIFT's compliance with those subpoenas violated the Fourth Amendment; the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. § 3401 *et seq.*; and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq*.  *See* Third Am. Compl. ¶¶ 31-104; *see also* Second Am. Compl. ¶¶ 45-59.  Because Plaintiffs' complaint attaches and relies heavily on the June 23, 2006 *New York Times* article, *see* Eric Lichtblau & James Risen, "Bank Data Sifted in Secret by U.S. to Block Terror," *N.Y. Times*, June 23, 2006 (hereinafter, "*N.Y. Times* Article"), the Chicago District Court construed the complaint as incorporating that article into the complaint's allegations.  *See* June 12 Order at 2 n.2.

**B.**  Treasury initiated the TFTP to serve as a vital tool in fighting domestic and foreign terrorism:  the program grew "out of the Bush administration's desire to exploit technological tools

to prevent another terrorist strike." *See N.Y. Times* Article at 2, 8.[2]  In order to gather the financial

transaction information necessary to operate the program, Treasury issued administrative subpoenas

to SWIFT because SWIFT is the "nerve center" of the global banking industry and a "crucial

gatekeeper, providing electronic instructions on how to transfer money among 7,800 financial

institutions worldwide." *See id.* at 2, 4, 8; *see also* Second Am. Compl. ¶ 14.

SWIFT has "'made clear that it could provide data only in response to a valid subpoena.'"

*See N.Y. Times* Article at 4 (quoting a written statement issued by SWIFT).[3]  The *N.Y. Times* article

notes that SWIFT has stated that it has "fully complied with all applicable laws" and has "insisted

that the data be used only for terrorism investigations and had narrowed the scope of the information

provided to American officials over time." *See id.*  SWIFT's data do "not allow the government to

---

[2] As Under Secretary Levey has testified, the TFTP has produced critical intelligence, and its benefits "have been incalculable":  the TFTP "provides a unique and powerful tool that has enhanced our efforts to track terrorist networks and disrupt them." *See* July 2006 Levey Testimony.

[3] As Under Secretary Levey has testified to Congress:

> The SWIFT subpoena is powerful but narrow. We cannot simply browse through the records that SWIFT turns over — we are only able to see that information which is responsive to targeted searches in the context of a specific terrorism investigation.  The data cannot be searched unless the analyst first articulates the specific link between the target of the search and a terrorism investigation.  I want to emphasize that we cannot search this data for evidence of non-terrorist-related crime, such as tax evasion, economic espionage, money laundering, or other criminal activity. As a result, we have accessed only a minute fraction of the data that SWIFT has provided.

Testimony of Stuart Levey, Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, Before the House Financial Services Subcommittee on Oversight and Investigations (July 11, 2006), *available at* http://www.ustreas.gov/press/releases/hp05.htm (hereinafter, "July 2006 Levey Testimony").

track routine financial activity, like A.T.M. withdrawals . . . or to see bank balances." *See id.* at 5. In addition, because of "privacy concerns" and the "potential for abuse," "the government sought the data only for terrorism investigations and prohibited its use for tax fraud, drug trafficking or other inquiries." *See id.*

The importance of SWIFT's information to Treasury's terrorism financing efforts has been substantial: it has "provided clues to money trails and ties between possible terrorists and groups financing them," and "[i]n some instances . . . the program has pointed them to new suspects, while in others it has buttressed cases already under investigation." *See id.* at 6. Among the "successes" of this program has been the capture of an al Qaeda operative known as Hambali, who is believed to have been the mastermind of the 2002 bombing of a Bali resort. *See id.* The program also "helped identify a Brooklyn man who was convicted on terrorism-related charges" by "aid[ing] a Qaeda operative in Pakistan by agreeing to launder $200,000 through a Karachi bank." *See id.*

**C.** Plaintiffs have never alleged that SWIFT disclosed information to the Treasury Department in the absence of an administrative subpoena; have never claimed that OFAC's administrative subpoenas were unlawful; and have never alleged that, in complying with those subpoenas, SWIFT failed to act in good faith.

In view of these sparse allegations, SWIFT moved to dismiss the Second Amended Complaint. On June 12, 2007, the Chicago District Court issued a Memorandum Opinion and Order denying SWIFT's motion to dismiss as to plaintiffs' Fourth Amendment and RFPA claims, and allowing plaintiffs to amend their complaint to correct pleading defects as to their claims alleged pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* *See* Memorandum Opinion and Order at 13, 17, 20 (June 12, 2007) (hereinafter, "Mem. Op."). The Chicago District Court also rejected SWIFT's arguments that plaintiffs lacked

standing and that SWIFT's compliance with the administrative subpoenas triggered IEEPA's immunity provision.  *See id.* at 7, 9.  The court contemporaneously granted SWIFT's motion to transfer the case, however, and pursuant to 28 U.S.C. § 1404(a), instructed the Clerk of the U.S. District Court for the Northern District of Illinois to transfer the case to the Eastern District of Virginia.  *See* Order (June 12, 2007).

On July 2, 2007, plaintiffs filed a Third Amended Complaint before this Court.  On July 9, 2007, defendant SWIFT filed a Motion for Partial Reconsideration or, in the Alternative, Certification for Interlocutory Appeal, seeking relief from the decision of the transferring court.  On the same day, the United States informed the Court that it was considering filing a memorandum setting forth the United States' interest in this case, on or before July 25, 2007.  *See* Notice by the United States of America of Its Potential Participation, at 2 (July 9, 2007).

## **ARGUMENT**

### I.   **SWIFT IS NOT LIABLE FOR ITS COMPLIANCE WITH A DULY AUTHORIZED ADMINISTRATIVE SUBPOENA ISSUED PURSUANT TO IEEPA.**

The Chicago District Court should have dismissed the case because IEEPA provides SWIFT with immunity from plaintiffs' claims.  *See* 50 U.S.C. § 1702(a)(3).  Plaintiffs allege that they were harmed by SWIFT's compliance with administrative subpoenas issued by Treasury pursuant to IEEPA (among other authorities); do not claim that those subpoenas were unlawful; do not allege that SWIFT ever disclosed information to the Treasury Department absent such a subpoena; and do not allege that SWIFT acted in anything other than good faith in complying with these subpoenas. To the contrary, plaintiffs incorporate into their Complaint the statement in the *New York Times* article that "SWIFT has made clear that it could provide data only in response to a valid subpoena," *see N.Y. Times* Article at 4.

-9-

These allegations plainly trigger Section 1702(a)(3), which provides private persons with immunity when they respond to any "instruction, or direction issued under [IEEPA]." The Chicago District Court's contrary conclusion — based on its view that statements in the *New York Times* article are susceptible to an inference that "at some point in time SWIFT officials were aware that their disclosures were legally suspect," *see* Mem. Op. at 9 — represents an erroneous application of IEEPA's safe-harbor provision and pleading standards that, if not corrected, would frustrate the safe harbor's purposes by allowing companies to be subjected to time-consuming and burdensome litigation that would dissuade timely compliance.

**A.      IEEPA's Safe-Harbor Provision Protects Entities Complying with IEEPA Administrative Subpoenas.**

Section 1702(a)(3) of IEEPA shields from liability "in any court" persons and companies "with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, [IEEPA], or any regulation, instruction, or direction issued under [IEEPA]." *See* 50 U.S.C. § 1702(a)(3).  The very purpose of this provision is to ensure that the United States receives necessary and timely cooperation from the private sector by protecting it from expensive, time-consuming, and distracting litigation.  As the legislative history provides:

> This section would presumably protect the bank which acted pursuant to a freezing order from being sued by persons claiming that they had no authority to do so.  It was intended, in a sense, to provide immunity, assuming that the actions were taken under regulations issued by the Government.

Hearings before the Subcommittee on International Economic Policy and Trade of the House Committee on International Relations, on the Markup of the Trading With the Enemy Reform Legislation, 95th Cong., 1st Sess., at 180-81 (June 8, 1977) (debate and questioning of Mr. Leonard E. Santos, Attorney Adviser, Office of the General Counsel, Department of the Treasury).

-10-

**B.      When SWIFT Complied with Administrative Subpoenas Issued Pursuant to IEEPA, It Should Be Presumed That SWIFT Acted in "Good Faith," and in the Absence of Any Credible Allegations to the Contrary, SWIFT Is Shielded from Liability.**

As noted, plaintiffs allege that SWIFT complied with administrative subpoenas issued pursuant to IEEPA; do not allege that the subpoenas were themselves unlawful; do not contend that SWIFT acted in other than good faith; and incorporate the statement from the *New York Times* that SWIFT "could provide data only in response to a valid subpoena." *See N.Y. Times* Article at 4.  The Chicago District Court recognized that plaintiffs did "not specifically address the question of 'good faith' as it pertains to SWIFT's actions in response to the government subpoenas," but declined to dismiss the case because certain vague statements in the *New York Times* article did not support a conclusion that SWIFT's actions "were clearly grounded in good faith reliance on Treasury Department subpoenas." *See* Mem. Op. at 8.  That was error.  Plaintiffs' allegations presumptively established the applicability of Section 1702(a)(3), and plaintiffs should have been required to plead allegations that, if true, would establish SWIFT's bad faith.

In complying with an administrative subpoena issued pursuant to IEEPA, SWIFT should be presumed to have acted in good faith and not be subject to liability "in the absence of a showing of lack of good faith."[4/]  Actions taken pursuant to IEEPA, such as the issuance of administrative subpoenas and acceptance of the recipient's production as in compliance with those subpoenas, are entitled to uniquely broad deference, befitting the exercise of the President's vast authority in the field of foreign affairs.  *See Regan*, 468 U.S. at 243; *see also United States v. Lindh*, 212 F. Supp.

---

[4] *See Alexewicz v. General Aniline & Film Corp.*, 43 N.Y.S.2d 713, 726 (N.Y. Sup. Ct. 1943).

2d 541, 559, 561 (E.D. Va. 2002) (Ellis, J.).[5/] When the recipient of a subpoena issued pursuant to

IEEPA complies with the government's request, it must be presumed that the recipient acts in good

faith reliance on this authority.

In *Alexewicz v. General Aniline & Film Corp.*, 43 N.Y.S.2d 713 (N.Y. Sup. Ct. 1943), the

court held that the nearly identical TWEA "safe harbor" provision carried a presumption that

compliance with governmental directions issued pursuant to TWEA was carried out in good faith.

In *Alexewicz*, plaintiff sued his employer for breach of contract; the employer had been "taken over

by the Secretary of the Treasury" and its employment contracts terminated as a result of sanctions

imposed in World War II. *See id.* at 717. Defendant contested liability for breach of plaintiff's

employment contract, arguing that it was "absolved from liability to the plaintiff by reason of the

action of the Treasury representative in terminating the contract of employment." *See id.* The court

found that Treasury's actions were constitutional, but noted that even if Treasury had lacked such

authority,[6/] defendant would be absolved from liability "in the absence of a showing of lack of good

faith," *see id.* at 726, thus holding that the *defendant was presumed to have acted in good faith in*

*relying on Treasury's authority to nullify the contract in question*. The analysis and disposition of

---

[5] *Lindh* contains a discussion of the applicable caselaw regarding the "sweeping powers" of the government in the realm of economic sanctions. *See Lindh*, 212 F. Supp. 2d at 561-62 & n.48.

[6] The plaintiff in *Alexewicz* "denie[d] the validity of the Treasury representative's action and question[ed] the constitutionality of Section 5(b)" of TWEA, "from which, in part at least, the Treasury representative derived his authority." *Alexewicz v. General Aniline & Film Corp.*, 43 N.Y.S.2d at 717. The New York state court found that the constitutionality of Section 5(b) is "well established and cannot seriously be questioned," *see id.* at 719, and that "the termination of the plaintiff's contract . . . was something which the Secretary of the Treasury had the power to bring about under the license, the Executive Order and the law," *see id.* at 724. In the present case, unlike in *Alexewicz*, plaintiffs do *not* challenge the legality of the administrative subpoenas issued to SWIFT.

-12-

*Alexewicz* should govern in this case.

Courts have construed other safe-harbor provisions to require plaintiffs to bear the burden of pleading that defendants' actions were taken in "other than in good faith."  *See Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1418 (7th Cir. 1992) (citing *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 513 (7th Cir. 1989)).  In construing a safe harbor established by the Securities and Exchange Commission for liability arising from "forward-speaking statements,"[7] for example, the Seventh Circuit found that plaintiff "bore the burden of pleading sufficient facts to call either the 'reasonable basis' or the 'good faith' issues into question," and "concluded that [plaintiff's] allegations on the 'reasonable basis' issue were insufficient, and the same analysis persuades us that [plaintiffs'] allegations about defendants' bad faith were equally deficient."  *See id.* at 1418-19.  Because plaintiffs failed to plead allegations sufficient to establish lack of good faith, the Seventh Circuit affirmed dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6).  *See id.* at 1419.[8]

---

[7] The safe-harbor provision at issue, Rule 175(a), entitled this defendant to good faith "'unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.'"  *See Wielgos*, 892 F.2d at 513 (citing SEC Rule 175).

[8] Likewise, the Sixth Circuit recently construed a safe-harbor provision to place the burden of persuasion on plaintiff in a case in which a wealthy investor sued a financial tipster and his employer, claiming that the tipster induced him to make a risky investment in a corporation that turned out to be fictitious.  *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 905 (6th Cir. 2007).  The tipster's employer sought immunity from secondary liability for the tipster's bad information, claiming that it was entitled to the "good faith safe harbor" of Section 20(b) of the Securities Act of 1934.  *See id.* at 921-22.  Similar to the IEEPA safe-harbor provision, Section 20(b) provides a safe harbor to "a controlling person who 'acted in good faith, and did not directly or indirectly induce the act or acts constituting the violation or the cause of action.'"  *See id.* at 922.  Because the Sixth Circuit found that "[n]o evidence to the contrary has been adduced" through summary judgment proceedings, and because the employer claimed no actual knowledge of its employee's activities, the court found that the employer was immune from liability pursuant to the safe harbor provision.  *See id.*  In short, the employer was not required to demonstrate good faith; rather, plaintiff was found to have failed to meet his burden of establishing that the employer had acted in other than good faith.  Although this issue was

(continued...)

The Supreme Court's recent decision in *Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007), confirms that, in order to survive dismissal, plaintiffs must plead facts that, if proven, would demonstrate that SWIFT was not acting in good faith.  *See id.* at 1965, 1974 (dismissing complaint because plaintiffs had "not nudged their claims across the line from conceivable to plausible"). Plaintiffs have filed four versions of their complaint in this case; all have failed to allege that SWIFT did *not* act in good faith.  Given that plaintiffs have not alleged "enough factual matter (taken as true) to suggest that" SWIFT acted in other than good faith, *see id.* at 1965, the Court should not manufacture a question as to SWIFT's good faith where none exists.  The Chicago District Court thus missed this point; indeed, it recognized that the *New York Times* reported that "SWIFT has made clear that it could provide data [to Treasury] only in response to a valid subpoena."  *See* Mem. Op. at 9; *see also N.Y. Times* Article, at 8.  This statement alone – particularly in the absence of any allegation in the Complaint to the contrary – should have ended the inquiry.[9]

The Chicago District Court also erred in relying on other statements in the *New York Times* suggesting that "SWIFT officials have been uneasy at times about their secret role," and after some alleged misgivings, agreed to continue providing data when "new controls were introduced."  *See N.Y. Times* Article at 3.  The Chicago District Court unreasonably inferred that any "uneasiness" on the part of SWIFT meant that SWIFT was concerned about the *legality* of the administrative subpoenas, which is not a fair reading of the *New York Times* article and is inconsistent with other

---

[8](...continued)
decided at summary judgment, the burden of persuasion in pleading sufficient facts should be similarly placed on plaintiffs here at the dismissal stage.

[9] *See also McCready v. eBay, Inc.*, 453 F.3d 882, 892 (7th Cir. 2006) (finding "[g]ood faith reliance on a [court-issued] subpoena" to be established in the allegations and to present a complete defense, thereby dismissing complaint).

allegations of the complaint.  *See Twombly*, 127 S. Ct. at 1968-69 (finding that a claim "may be supported by showing any facts consistent with the allegations in the complaint").  Indeed, the court's inference of a question as to SWIFT's good faith explicitly contradicts other statements in the article — for example, where SWIFT states that it "has fully complied with all applicable laws." *See N.Y. Times* Article at 4.

The Chicago District Court also erred in concluding that plaintiffs "allege something other than mere compliance with a government-issued subpoena," *see* Mem. Op. at 9, and that "SWIFT's initial response to the government's request for information was overbroad, in that SWIFT turned over to government officials 'the entire SWIFT database.'" *See id.* at 3 (citing Second Am. Compl. ¶ 14).  Plaintiffs allege no such thing.  Instead, the Chicago District Court, evaluating only an allegation that SWIFT turned over "the entire SWIFT database" to the government, unreasonably inferred that plaintiffs were alleging that SWIFT did something other than comply with the administrative subpoenas.  In fact, nowhere in the complaint do plaintiffs actually allege that SWIFT provided "financial records" beyond the scope of the administrative subpoenas.  Even assuming *arguendo* that SWIFT actually turned over "the entire SWIFT database" to Treasury, plaintiffs nevertheless fail to allege that this was *not* in compliance with a duly authorized administrative subpoena.[10]

---

[10] Notably, the *New York Times* article describes a process whereby Treasury and SWIFT negotiated the scope of the administrative subpoena, which is absolutely appropriate and an expected element of compliance with an administrative subpoena.  *See In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000).  For example, the *New York Times* reports that SWIFT "had narrowed the scope of the information provided to officials over time" and that "[o]fficials realized the potential for abuse, and narrowed the program's targets and put in more safeguards." *See N.Y. Times* Article, at 4, 9.  This is not an example of bad faith or, indeed, anything other than good faith.  It is but an example of  "reasonable efforts . . . to reach accommodation with the government" in order to alleviate the burden of complying with an administrative subpoena, and

(continued...)

The Chicago District Court's shifting of the burden of persuasion on "good faith" – by requiring SWIFT to prove, following discovery, that it acted in good faith – has serious potential negative consequences for the United States' interests in obtaining smooth compliance with administrative subpoenas pursuant to Congress's design under IEEPA.  A reading of IEEPA that would place the burden on SWIFT (or any other such entity) to prove its good faith, in addition to its mere compliance with valid, Treasury-authorized administrative subpoenas, could cause banks to question and second-guess economic sanctions imposed by the government.  These sanctions programs often depend on immediate action by banks for their effectiveness as a tool in combating terrorist transactions.  To create a delay as a consequence of such second-guessing would be detrimental to those programs.  And to shift the burden of persuasion on "good faith" could force SWIFT (or similar subpoena recipients) to seek a court ruling in each instance before complying with a subpoena, or at least seek the most narrow interpretation possible of a given administrative subpoena request, thereby frustrating the intent of IEEPA.  IEEPA was designed to accord the Executive "sweeping powers" to implement economic sanctions without delay.  *See Lindh*, 212 F. Supp. 2d at 561.  And such a shift in the burden of persuasion could frustrate the intent of Exec. Order No. 13,224, in which the President vested the widest possible discretion in the Treasury Department "to employ all powers granted to the President by IEEPA . . . as may be necessary to carry out the purposes" of the Executive Order on global terrorism.  *See* Exec. Order No. 13,224, § 7.

A district court must enforce a federal agency's investigative subpoena if it is "not plainly incompetent or irrelevant to any lawful purpose of the [agency]."  *See Endicott Johnson Corp. v.*

---

[10](...continued)
such negotiations are entirely proper.  *See In re Subpoena Duces Tecum*, 228 F.3d at 351.

*Perkins*, 317 U.S. 501, 509 (1943).  Given "the presumption of administrative regularity and good

faith" that already attends agency issuances of administrative subpoenas, *see Federal v. Owens-*

*Corning Fiberglas Corp.*, 626 F.2d 966, 975 (D.C. Cir. 1980), as well as consideration of judicial

economy, subpoena recipients should not be put to the trouble of securing what should be a foregone

conclusion — namely, an order finding them bound to comply with a duly authorized administrative

subpoena issued pursuant to IEEPA.  Thus, the Court should find SWIFT covered under the safe

harbor pursuant to 50 U.S.C. § 1702(a)(3) and dismiss the case accordingly.[11]

---

[11] This case should also be dismissed because plaintiffs have failed to adequately allege
that they have suffered "an invasion of a legally protected interest which is concrete and
particularized, as well as actual or imminent."  *Friends for Ferrell Parkway, LLC v. Stasko*, 282
F.3d 315, 320 (4th Cir. 2002) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),
Inc.*, 528 U.S. 167, 180-81 (2000)).  Plaintiff Kruse adds to his Third Amended Complaint, for
the Illinois state law claim, a conclusory allegation that "[u]pon information and belief, some or
all of the financial records of Plaintiff Kruse . . . were in the SWIFT database at the time SWIFT
disclosed it to the US Government." Third Am. Compl. ¶ 57.  Plaintiff Walker does not make
any similar allegation, nor does he provide any information regarding his financial institutions.
Neither plaintiff can satisfy the requirements for standing.  Their alleged injury depends on an
inference drawn from a single statement in the *New York Times* article that "[o]ne person close to
the [TFTP] operation said 'At first they got everything -- the entire SWIFT database.'" Third
Am. Compl. ¶ 11; *see also N.Y.Times* Article at 8.  Plaintiffs reason that because they each
completed "at least one international financial transaction since September 11, 2001," Third Am.
Compl. ¶¶ 7, 8, their financial records must have been among the "entire SWIFT database"
allegedly disclosed "[a]t first" to the United States.  Plaintiffs' inference is too speculative to
satisfy the standards of Article III, especially since the *New York Times* article on which they
rely contains other statements that undermine their inference that their transactions were among
those produced.  As the *New York Times* indicates, "[m]ost routine financial transactions
confined to this country are not in the database," and the scope of the transaction information
produced by SWIFT narrowed over time.  *N.Y.Times* Article at 2, 9.  Plaintiffs' failure to plead
that their international financial transactions occurred soon after September 11 is a critical
omission given that the key allegation is that the "entire database" was turned over only "at
first," i.e., "[w]ithin weeks of 9/11."  *Id.* at 8.  Their failure to plead this necessary temporal
element after four iterations of their complaint makes their alleged injury "wholly speculative."
*Friends for Ferrell Parkway*, 282 F.3d at 321.
        Plaintiffs' standing to seek an "injunction prohibiting Defendants' continued or future
participation in the TFTP" is even more tenuous.  Third Am. Compl., Prayer for Relief.
Plaintiffs have not alleged an intention to engage in any foreign or international transactions that
                                                                                                (continued...)

-17-

## II. THE TERRORIST FINANCE TRACKING PROGRAM DOES NOT IMPLICATE EITHER THE FOURTH AMENDMENT OR THE RIGHT TO FINANCIAL PRIVACY ACT.

### A. Plaintiffs Have No Fourth Amendment Interest in Financial Information Voluntarily Disclosed to Their Banks.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. As the Fourth Circuit has recently instructed, "[t]he protections of the Fourth Amendment are triggered when an individual seeking refuge under the Fourth Amendment 'has a legitimate expectation of privacy in the invaded place' or the item seized." *Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). And, in this respect, "[a] legitimate expectation of privacy exists when the individual seeking Fourth Amendment protection maintains a 'subjective expectation of privacy' in the area searched that 'society [is] willing to recognize ... as reasonable.'" *Id.* (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). Application of these principles here precludes plaintiffs' Fourth Amendment claim because it has been settled law since at least 1976 that there is no "legitimate expectation of privacy" in financial records held by third parties, *United States v. Miller*, 425 U.S. 435 (1976), and therefore plaintiffs cannot raise a Fourth Amendment challenge to the alleged disclosure of information derived from their financial records.

The Supreme Court's decision in *Miller* addressed whether the government's acquisition of

---

[11](...continued)
likely would be the subject of a SWIFT message, or that any such SWIFT message would likely be disclosed to the government pursuant to the TFTP in the future. Thus, they have failed to show a "sufficiently real and immediate" threat of future injury sufficient to obtain injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983).

respondent Miller's financial records from two banks through the use of allegedly defective subpoenas *duces tecum* violated Miller's Fourth Amendment rights.  *Miller*, 425 U.S. at 437. Employing the general rule "that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed," *id.* at 443 (citing cases), the Supreme Court, in an opinion by Justice Powell, held that because Miller had "voluntarily conveyed" his financial information to banks and "their employees in the ordinary course of business," he could no longer claim a "legitimate expectation of privacy" in that information because he had assumed "the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government."  *Id.* at 442-43 (citing *United States v. White*, 401 U.S. 745, 751-52 (1971)).  Thus, because Miller did not have a "legitimate expectation of privacy" in the financial records obtained by the government from the banks, Miller "lack[ed] the requisite Fourth Amendment interest to challenge the validity of the subpoenas." *Id.* at 446; *see also id.* at 455-56 (Marshall, J., dissenting) ("Since the Court in *California Bankers Assn.* held that a bank, in complying with the requirement that it keep copies of checks written by its customers, 'neither searches nor seizes records in which the depositor has a Fourth Amendment right,' there is nothing new in today's holding that respondent has no protected Fourth Amendment interest in such records.  *A fortiori*, he does not have standing to contest the Government's subpoena to the bank.").

The Supreme Court's holding in *Miller*, and the legion of subsequent Supreme Court and lower court decisions reaffirming its holding,[12] requires dismissal of plaintiffs' Fourth Amendment

---

[12]*See, e.g., Smith v. Maryland*, 442 U.S. 735, 744 (1979) (citing *Miller* for the proposition
(continued...)

claims. Plaintiffs are challenging the disclosure of financial records by SWIFT to the United States government. *See* Third Am. Compl. at ¶ 1. And, to the extent plaintiffs' records are at issue in this challenge, plaintiffs "voluntarily conveyed" these financial records to third parties, specifically, their financial institutions. *See*, *e.g.,* Third Am. Compl. ¶¶ 40, 41, 48. As *Miller* instructs, plaintiffs do not have a "legitimate expectation of privacy" in those financial records, and therefore no standing to challenge the subsequent disclosure of information that may be derived from those financial records by SWIFT to the United States government.

Although the Chicago District Court recognized *Miller's* holding that "private citizens have no Fourth Amendment rights in financial records created and shared in the ordinary course of business," it nevertheless upheld plaintiffs' Fourth Amendment claim by relying on *dicta* in *Miller* it viewed as suggesting that persons without a Fourth Amendment interest in financial records could still challenge the acquisition of such records by the government if they could show that the records were obtained "outside the bounds of 'existing legal process.'" Mem. Op. at 10-11. Based on plaintiffs' allegation that "SWIFT disclosed more information than was requested by the government," which "brings the case outside the bounds of 'existing legal process,'" the district court refused to dismiss plaintiffs' Fourth Amendment claims. *Id.* at 11.

In addition to the obvious logical difficulties of this ruling, which would permit a claimant without a Fourth Amendment interest in records to nevertheless raise a Fourth Amendment challenge to the manner in which the government obtained the records, the Chicago District Court's

---

[12](...continued)
"that a bank depositor has no 'legitimate expectation of privacy' in financial information 'voluntarily conveyed to . . . banks and exposed to their employees in the ordinary course of business.'"); *Guest v. Leis*, 255 F.3d 325, 335-36 (6th Cir. 2001) (same); *Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000) (same).

ruling, which it acknowledged is based on *dicta* in *Miller*, is foreclosed by the Supreme Court's

subsequent decision in *United States v. Payner,* 447 U.S. 727 (1980).  In *Payner*, government agents

obtained defendant Payner's incriminating financial records "by exploiting a flagrantly illegal

search" in which a private detective working at the direction of a government agent stole a bank

officer's briefcase containing the at-issue financial records from his hotel room while the bank

officer dined with a female employee of the detective who had befriended the bank officer as part

of the caper.  *Id.* at 729-30.  The private detective delivered the stolen briefcase to the government

for hasty photocopying of its contents, before replacing it in the bank officer's hotel room in the nick

of time.  *Id.*  The Supreme Court held that, notwithstanding the clear illegality of the search, Payner

lacked standing to raise a Fourth Amendment challenge to the government's use of the bank records

in his prosecution because "a depositor has no expectation of privacy and thus no 'protectable

Fourth Amendment interest' in copies of checks and deposit slips retained by his bank." *Id.* at 731-

32 (quoting *Miller*, 425 U.S. at 435).[13/]  *Payner* confirms that a Fourth Amendment claimant with

no expectation of privacy in financial records "voluntarily conveyed" to third parties cannot

challenge the legal process by which the government has obtained such records, even when the

process is clearly outside the bounds of "existing legal process."  The Chicago District Court's

decision to the contrary was clearly wrong.

      Although, for the reasons stated, the Court need not address the legality of the administrative

---

[13]Although *Miller* and *Payner* were criminal cases in which Article III jurisdiction was
not at issue, the Supreme Court expressed its holdings employing the language of standing.  *See,
e.g., Payner*, 447 U.S. at 731-32 ("The foregoing authorities establish, as the District Court
recognized, that respondent lacks standing under the Fourth Amendment to suppress the
documents illegally seized from Wolstencraft.").  Whether plaintiffs' Fourth Amendment claims
are viewed in a failure to state a claim context, or as a failure to satisfy the standing requirement
of an injury in fact to a "legally protected interest," the result is the same and dismissal is
required.

subpoenas issued to SWIFT, it is important to note that, in contrast to the search at issue in *Payner*, SWIFT's production of records pursuant to an administrative subpoena was clearly within the bounds of "existing legal process." *See generally United States v. American Target Advertising, Inc.*, 257 F.3d 348, 351 (4th Cir. 2001) (setting forth requirements for judicial enforcement of administrative subpoena and noting that "a district court's role in enforcing administrative subpoenas is sharply limited."). Indeed OFAC's negotiation with SWIFT and acceptance of SWIFT's production as in compliance with its subpoenas is "entitled to a presumption of administrative regularity and good faith." *See F.T.C. v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 975 (D.C. Cir. 1980). Moreover, the district court's assumption that plaintiffs' mere allegation of overproduction despite the agency's acceptance of SWIFT's response to its subpoena would take the case "outside the bounds of 'existing legal process'" is legally incorrect. *See F.T.C. v. Carter*, 636 F.2d 781, 787-88 (D.C. Cir. 1980) (agency's own appraisal of relevancy must be accepted so long as it is not "obviously wrong."). Thus, plaintiffs' Fourth Amendment claims must be dismissed.

**B.      Plaintiffs Have No Cause of Action Under the Right to Financial Privacy Act.**

The Supreme Court has recognized that "the 'most salient feature of [RFPA] is the narrow scope of the entitlements it creates,' because [C]ongress wanted to 'minimize[ ] the risk that customers' objections to subpoenas will delay or frustrate agency investigations.'" *United States v. Daccarett*, 6 F.3d 37, 51 (2d Cir. 1993) (quoting *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984)). Consistent with this narrow scope, RFPA's prohibitions on the disclosure of financial information apply only to the disclosure by "financial institutions"[14] of their "customers'"[15]

---

[14]The statute defines a "financial institution" as "any office of a bank, savings bank, card
(continued...)

financial records.  *See* 12 U.S.C. § 3402, 3403; *see also* H.R. Rep. No. 95-1383, at 28, *reprinted in* 1978 U.S.C.C.A.N. 9273, 9305 (RFPA "is intended to protect the customers of financial institutions").  Because SWIFT is not a "financial institution," and because neither plaintiff is a "customer" of SWIFT, RFPA simply does not apply to the facts alleged here.

In its Memorandum Opinion, the Chicago District Court appropriately held that "SWIFT does not fit this definition of a financial institution." Mem. Op. at 14.  Plaintiffs no longer allege otherwise.  *Compare* Third Am. Compl. ¶ 4 *with* Second Am. Compl. ¶ 4.  Likewise, plaintiffs have not alleged that they are "customers" of SWIFT.  Indeed, plaintiffs allege that SWIFT's customers are "7,800 financial institutions in more than 200 countries,"  Third Am. Compl. ¶ 3, and that they are customers of those financial institutions, such as TCF Bank, where they maintain individual accounts in their names.  *See* 12 U.S.C. § 3401(5); *see also* Third Am. Compl. ¶¶ 40 ("Plaintiff Kruse is a customer of TCF Bank"), 48 ("Plaintiff Kruse is a customer of Visa").  Accordingly, because plaintiffs "'never maintained accounts in their names at [SWIFT],' there was no violation of RFPA." *Organizacion JD LTD v. U.S. Dep't of Justice*, 18 F.3d 91 (2d Cir. 1994) (per curiam) (quoting *United States v. Daccarett*, 6 F.3d 37, 51-52 (2d Cir. 1993)).

The Chicago District Court skirted these obvious defects by finding that plaintiffs had sufficiently alleged that SWIFT is an "agent" of their financial institutions, and that this agency

---

[14](...continued)
issuer as defined in section 1602(n) of Title 15, industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution" located in the United States or its territories.  12 U.S.C. § 3401(1).

[15]The statute defines a "customer" as "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom the financial institution is acting or has acted as a fiduciary, in relation to an account maintained in the person's name."  12 U.S.C. § 3401(5).

relationship was a sufficient basis for refusing to dismiss plaintiffs' RFPA claims.  Mem. Op. at 15-17.  This decision is wrong on both counts.  First, the *legal conclusion* that SWIFT is an agent of plaintiffs' financial institutions is plainly contrary to the *factual allegations* contained in the Third Amended Complaint, and need not be accepted.  Second, even if this alleged agency relationship is accepted, it does not provide plaintiffs with a cognizable RFPA claim against SWIFT.

Plaintiffs' assertion that SWIFT is an "agent" of plaintiffs' financial institutions need not be accepted by this Court.  *See*, *e.g., Twombly*, 127 S. Ct. at 1965 (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  In the context of litigation "[t]he party asserting that a relationship of agency exists generally has the burden in litigation of establishing its existence." Restatement (Third) Agency § 1.02 comment d; *see also Stiegerwald v. Bradley*, 136 F. Supp. 2d 460, 470 (D. Md. 2001).  And, in this respect, "[a] complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship. It is insufficient to merely plead the legal conclusion of agency."  *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 498, 675 N.E.2d 584, 595 (1996); *see also* Restatement (Third) Agency § 1.02 (agency arises only when the elements of agency relationship are present).  The factual predicates of an agency relationship include: "the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent." *Stiegerwald*, 136 F.Supp. 2d at 470.  Plaintiffs have not alleged the existence of any of these elements.  Indeed, a review of the Third Amended Complaint in its entirety establishes that SWIFT is not an "officer, employee[], or agent of a financial institution" with the ability to legally bind its financial institution customers, but rather an independent provider of "secure, standardized messaging services and interface software" to thousands of financial institution customers.  Third

Am. Compl. ¶ 3; *see also id.* at ¶¶ 11, 45 (describing SWIFT's provision of messaging services); *id.* at ¶ 46 ("TCF is a customer of SWIFT"); *id.* at ¶ 53 ("Visa is a customer of SWIFT"). These allegations do not establish the factual predicates of an agency relationship, but actually undercut plaintiffs' allegations of agency. This fact alone is a sufficient ground for dismissal of plaintiffs' RFPA claims.

But, as SWIFT correctly points out, even if plaintiffs' allegations of "agency" are accepted, plaintiffs' claims against SWIFT must still be dismissed because although RFPA may prohibit an "agent of a financial institution" from providing the Government access to financial records, 12 U.S.C. § 3403(a), it does not provide a *cause of action* against that agent. 12 U.S.C. § 3417(a)*; see also Liffiton v. Keuker*, 850 F.2d 73, 78-79 (2d Cir. 1988) (RFPA "does not impose civil liability upon individual officers, employees *or agents of financial institutions*" (emphasis added)); *Strother v. Harte*, 171 F. Supp. 2d 203, 207 (S.D.N.Y. 2001) (stating that RFPA bars suits against anyone other than a financial institution or government agency). Thus, plaintiffs' RFPA claims must be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Court should grant SWIFT's Motion for Reconsideration and dismiss Plaintiffs' Third Amended Complaint.[16]

Dated: July 25, 2007                                    Respectfully submitted,

---

[16] As the United States has previously informed the Court, further proceedings in this case may also raise the issue of the state secrets privilege. *See United States v. Reynolds*, 345 U.S. 1, 7 (1953); *El-Masri v. United States*, 479 F.3d 296, 302-03 (4th Cir. 2007), *petition for cert. filed*, 75 U.S.L.W. 3663 (U.S. May 30, 2007) (No. 06-1613). Should the Court decide not to dismiss the case, the United States respectfully requests the opportunity to consider the application of the state secrets privilege to further litigation of plaintiffs' surviving claims at that time.

OF COUNSEL:

ROBERT F. HOYT
General Counsel
U.S. Department of the Treasury

PETER D. KEISLER
Assistant Attorney General
Civil Division

CHUCK ROSENBERG
United States Attorney

CARL J. NICHOLS
Deputy Assistant Attorney General
Federal Programs Branch, Civil Division

JOSEPH H. HUNT
Director, Federal Programs Branch

DOUGLAS N. LETTER
Terrorism Litigation Counsel

SANDRA M. SCHRAIBMAN
Assistant Director, Federal Programs Branch

_____/s/_____
ANDREA GACKI  (D.C. Bar No. 462024)
JOHN R. COLEMAN  (Va. State Bar No. 70908)
Trial Attorneys
U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W., Room 7334
Washington, D.C. 20001
Tel.:    (202) 514-4336/(202) 514-4505
Fax:    (202) 318-2461/(202) 616-8187
Email:  andrea.gacki@usdoj.gov
             john.coleman3@usdoj.gov


_____/s/_____
R. JOSEPH SHER
LAUREN A. WETZLER
Assistant United States Attorneys
Office of the United States Attorney
2100 Jamieson Ave.
Alexandria, VA.  22314
Tel.:    (703) 299-3747
Fax:    (703) 299-3983
Email:  joe.sher@usdoj.gov

lauren.wetzler@usdoj.gov

*Attorneys for the United States of America*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2007, the foregoing was filed with the Court's Electronic

Case Filing System, and copies were also sent via electronic mail to the following counsel of

record:

Steven E. Schwarz, Esq.
The Law Offices of Steven E. Schwarz, Esq.
2461 W. Foster Ave., #1W
Chicago, IL.  60625
Email:  stevenschwarz23@yahoo.com

Gordon Samuel Woodward, Jr.
Schnader Harrison Segal & Lewis LLP
2001 Pennsylvania Ave., N.W., Suite 300
Washington, D.C.  20006-1825
Email: gwoodward@schnader.com

*Counsel for Plaintiffs*

Peter H. White, Esq.
Mayer Brown Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C.  20006-1101
Email: pwhite@mayerbrownrowe.com

Andrew S. Marovitz, Esq.
Catherine A. Bernard, Esq.
Mayer Brown Rowe & Maw LLP
71 South Wacker Drive, Suite 1700
Chicago, IL.  60603
Email: amarovitz@mayerbrownrowe.com
          cbernard@mayerbrownrowe.com

David I. Gelfand, Esq.
Shawn J. Chen, Esq.
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Ave, N.W.
Washington, D.C.  20006-1801
Email: dgelfand@cgsh.com
          schen@cgsh.com

*Counsel for Defendant*


    /s/ John R. Coleman
JOHN R. COLEMAN
Trial Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch