**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **IAN WALKER and STEPHEN KRUSE,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07cv635** |
| | ) | |
| **S.W.I.F.T. SCRL,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

In this transferred federal question case, two individuals, for themselves and on behalf of a putative class, seek damages and injunctive relief against a supplier of financial messaging services for violations of the First and Fourth Amendments of the U.S. Constitution, the Right to Financial Privacy Act, 12 U.S.C. §§ 3401, *et seq.* (RFPA), and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* (ICFDBPA).  These violations allegedly occurred in the course of defendant's response to administrative subpoenas issued by the United States Department of the Treasury under the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* (IEEPA).

Filed originally in the Northern District of Illinois, the case was transferred to this district pursuant to 28 U.S.C. § 1404(a).  Prior to transfer, the transferor court granted in part and denied in part defendant's motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  In passing, the Illinois district court found that plaintiffs had standing to assert their claims.  Following transfer, defendant filed a motion in this district seeking reconsideration of the denial in part of its motion to dismiss and plaintiffs filed an opposition.  As the issues raised by the motion and opposition have been fully briefed and argued, the motion is now ripe for disposition.

1

For the reasons that follow, reconsideration of the Illinois district court's ruling on the motion to dismiss is premature, as it is first necessary to consider the jurisdictional issue of plaintiffs' standing. A review of this issue reflects that the complaint[1] fails to allege sufficient facts to support standing, and hence the complaint must be dismissed without prejudice. Plaintiffs will be given leave to file an amended complaint that satisfies standing, provided they can do so in accordance with Rule 11, Fed. R. Civ. P.

**I**.

Plaintiffs Ian Walker and Stephen Kruse are private individuals who are office workers residing in Washington, D.C. and Chicago, Illinois, respectively. According to the complaint, each plaintiff has completed numerous domestic financial transactions since September 11, 2001, and at least one international financial transaction since that date. Yet absent from the complaint is any allegation identifying any specific transactions or the financial institutions plaintiffs used in connection with these transactions.

Defendant S.W.I.F.T. SCRL (the Society for Worldwide Interbank Financial Telecommunication, or SWIFT) is an international cooperative consortium of banks, brokers, and investment managers. Based in Brussels and with its principal American place of business in northern Virginia, SWIFT supplies secure standardized messaging services to financial institutions. Quoting from SWIFT's website, the complaint describes the SWIFT consortium as follows:

---

[1]Reference here is to the Second Amended Complaint. Although the Illinois district court granted plaintiffs leave to file a Third Amended Complaint to correct pleading defects in their state law claim, plaintiffs did not file such an Amended Complaint until the filing deadline had passed and the case had been transferred to this district. Because the Third Amended Complaint was not timely filed, and because defendant seeks reconsideration of the Illinois district court's rulings with regard to the Second Amended Complaint, the appropriate focus of the present analysis is the Second Amended Complaint.

> "Defendant SWIFT is 'the financial industry-owned co-operative supplying secure, standardized messaging services and interface software to 7,800 financial institutions in more than 200 countries. SWIFT's worldwide community includes banks, broker/dealers and investment managers, as well as their market infrastructures in payments, securities, treasury and trade.'"

Additionally, the complaint notes that most of the eleven million transactions per day handled by SWIFT are international in nature in that they involve communication across national borders.

Because the sufficiency of the complaint's factual allegations is at issue, it is important to focus here on these allegations. They are contained in approximately three pages of the fifteen page, four count complaint. One of these pages is devoted to quoting from websites of various foreign government agencies[2] to the effect that SWIFT's disclosure of financial data to the U.S. government violates various foreign laws. More to the point for the standing question at issue, the complaint cites a June 23, 2006 *New York Times* article reporting on the existence of the Terrorist Financing Tracking Program (TFTP), a post-9/11 initiative of the federal executive branch to track funds flowing to international terrorist organizations. To achieve this goal, the *Times* article noted, the Treasury Department issued administrative subpoenas pursuant to the TFTP (and presumably the IEEPA as well). The *Times* article also reported that SWIFT, in compliance with administrative subpoenas, had provided the government with information concerning financial transmissions SWIFT had facilitated. The article did not identify the specific financial information SWIFT disclosed, but instead reported conflicting comments from unnamed sources on this subject. Thus, the Times article quoted one unnamed person "close to the operation" as saying "[a]t first, they got everything — the entire Swift database." Yet, the article also reported that following a meeting

---

[2]Specifically, the agencies are (i) the Data Protection Commission of the German state Schleswig-Holstein, (ii) the Belgian Privacy Commission, (iii) the Swiss Data Protection and Information Commissioner, and (iv) the Article 29 Working Party of the European Commission.

between SWIFT and administration officials, tighter controls were imposed which limited the volume of data disclosed.  The *Times* article is silent on the nature and extent of this putative negotiated limitation.

Plaintiff Walker filed the present suit against SWIFT on June 23, 2006 — the same day the *Times* article was published — in the United States District Court for the Northern District of Illinois.  Plaintiff Kruse was added as a plaintiff on February 27, 2007.  The complaint alleged four counts of wrongdoing.  Count I alleged that SWIFT "denied Plaintiffs . . . their rights to speak and receive speech privately under the First Amendment."  Count II alleged that SWIFT "violated [their] reasonable expectations of privacy and denied . . . their right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the Constitution of the United States."  Count III alleged that SWIFT violated the RFPA when it "disclosed information contained in customer financial records without reasonable description or any of the other five criteria enumerated" in the statute.  Count IV alleged that SWIFT engaged in unfair, unlawful and/or fraudulent business practices in contravention of the ICFDBPA.

Defendant SWIFT filed two motions in response to the complaint: (i) a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and (ii) a motion to dismiss on *forum non conveniens* grounds, which the Illinois district court construed as a motion to transfer venue pursuant to 28 U.S.C. § 1404(a).  The Illinois district court ruled on the defendant's motion to dismiss for failure to state a claim, granting that motion with respect to Counts I and IV but denying it with respect to Counts II and III.  Although defendant did not file a separate motion to dismiss for lack of standing under Rule 12(b)(1), the motion to dismiss for failure to state a claim raised the standing issue, and the Illinois district court ruled on that issue as well, concluding that

the complaint demonstrated plaintiffs' standing.  Following these rulings, the Illinois district court

granted SWIFT's transfer motion and the matter was transferred to this district pursuant to 28 U.S.C.

§ 1404(a).[3]

## II.

The Illinois district court, relying on the Seventh Circuit's decision in *Venture Associates*

*Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993), ruled that the *Times* article

should be treated as part of the pleadings because it was "central to the claims in this case" and had

been attached to defendant's motion to dismiss.  Based on this ruling, the Illinois district court

determined that the *Times* article could be used to "fill[]" certain "holes" in the plaintiffs' complaint.

The Illinois district court's reliance on the *Times* article to supplement the allegations in the

complaint merits further consideration.

It is certainly true, as the Illinois district court noted, that documents referred to in a

complaint may, in certain circumstances, be considered part of the complaint for the purpose of

evaluating a dismissal motion.  *See, e.g.*, *American Chiropractic Ass'n, Inc. v. Trigon Healthcare,*

*Inc.*, 367 F.3d 212, 234 (4th Cir. 2004); 5A Charles Alan Wright & Arthur R. Miller, *Federal*

*Practice & Procedure* § 1327 (3d ed. 2004).[4]  Yet it is important to note that this principle does not

apply to any and all documents that might be referenced in a complaint; rather, this principle requires

more: it requires that the referenced document be central or integral to the claim in the sense that its

---

[3]Plaintiffs initially filed, but then withdrew, a request for reconsideration of the transfer decision.

[4]In this case the complaint referred to, but did not attach, the *Times* article; instead, the *Times* article was attached to the defendant's motion to dismiss.  This does not change the present analysis. *See American Chiropractic*, 367 F.3d at 234; *Venture Associates*, 987 F.2d at 431.

very existence, and not the mere information it contains, gives rise to the legal rights asserted.  The cases illustrate this requirement.  Thus, where a complaint in a fraud action references a document containing the alleged material misrepresentations, the referenced document may be considered part of the complaint.[5]  Similarly, a newspaper article reporting allegedly fraudulent statements by a corporate officer may be considered part of the complaint in a securities fraud action,[6] and an allegedly libelous magazine article referred to in a complaint may be considered part of the complaint in a libel action based on that article.[7]  Importantly, the *Times* article does not fit within this principle; it is not 'central' to plaintiffs' case in the legally relevant manner because its existence did not create the legal rights asserted.  At most, it provided plaintiffs with some notice of a possible right of action.

The question then is whether the *Times* article may appropriately be used by plaintiffs or a court to supplement or fill holes in the complaint.  The article may not be so used because it does not give rise to the causes of action alleged in the complaint, nor is it central or integral to those causes of action.  Instead, it merely reports information of questionable reliability.  As such, the *Times* article does not fit within the *Venture Associates / American Chiropractic* line of cases and should not be used to fill factual holes in the complaint's allegations.  Put differently, the *Venture Associates / American Chiropractic* line of cases does not extend to allow parties to fill gaps in their

---

[5]*American Chiropractic*, 367 F.3d at 234 ("American Chiropractic explicitly referred to the [document], and its mail and wire fraud claims are *based on the alleged misrepresentation made in that document*.") (emphasis added).

[6]*Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 611–13, 618 (4th Cir. 1999).

[7]*Fudge v. Penthouse International, Ltd.*, 840 F.2d 1012, 1014–15 (1st Cir. 1988).

factual allegations by reference to unnamed or anonymous sources in a newspaper article.[8]  To

conclude otherwise would allow parties to circumvent Rule 11's duty to conduct "an inquiry

reasonable under the circumstances," Fed. R. Civ. P. 11, and would serve to reduce that duty to the

mere purchase of a newspaper.  If Rule 11's requirement of a reasonable investigation is to be given

its proper effect, courts must view with caution, and some skepticism, parties' claims to incorporate

newspaper articles to fill gaps in a complaint's allegations.  Of course, there may be circumstances

when a newspaper article contains reliable information that may be used consistent with Rule 11's

reasonable inquiry requirement.  For example, an article reporting uncontroversial facts such as the

public occurrence of an event, or the closing price of a corporation's stock, or weather conditions

may provide enough information to satisfy a reasonable inquiry under Rule 11.  The *Times* article

in this case does not fall within this category, especially given that it relies largely on anonymous

sources and contains contradictory information.  Reliance on anonymous sources is particularly

troublesome under Rule 11 because unless the source is later identified, there is no way to verify the

reliability of the information.[9]  In other words, if an anonymous source remains anonymous, there

appears to be no way to conduct a reasonable inquiry into the source's reliability.

---

[8]It is worth noting that this principle holds true whether the article is from the *New York Times*, the *Wall Street Journal*, or the *Wichita Eagle* because history shows that all newspapers, great and small, have fallen prey at one time or another to publishing false or unreliable stories.  *See, e.g.*, David A. Maraniss, *Post Reporter's Pulitzer Prize is Withdrawn*, Washington Post, April 16, 1981, at A1 (chronicling the fabrications in a Pulitzer Prize-winning *Post* article).

[9]An Eighth Circuit decision well illustrates this point.  In *United States v. Tri-State Ins. Co. of Minnesota*, the government argued that an anonymous tip provided sufficient notice to trigger a statute of limitations.  946 F.3d 581 (8th Cir. 1991).  The Eighth Circuit rejected this argument, stating: "We have little doubt but that if an attorney filed suit based on such an anonymous tip that later proved to be from an unreliable source or that slight investigation would prove to be false, Rule 11 sanctions would be seriously considered."  *Id.* at 583.

In sum, it appears that plaintiffs' complaint, which was filed the very day the *Times* article was published, relies heavily on the anonymous and contradictory information contained in that article. This reliance cannot relieve plaintiffs of their important Rule 11 obligation given the difficulty in determining the reliability of anonymous sources. In any event, as will be seen, reliance on the *Times* article would not suffice to fill the factual holes in the Second Amended Complaint even if such reliance were appropriate.

## III.

Two further issues must be addressed before the merits of defendant's reconsideration motion may appropriately be considered. First it is important to address whether the law of the case doctrine bars review here of the Illinois district court's decision. If review here is not barred by that doctrine, then it is next necessary to consider whether plaintiffs have alleged facts adequate to establish standing to pursue their federal claims.

## A.

The law of the case doctrine provides, at its simplest, that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988). In so providing, the doctrine is designed to serve the goals of finality and predictability in the trial court. Yet the doctrine is neither absolute nor inflexible; it is a rule of discretion rather than a jurisdictional requirement. *Smith v. Bounds*, 813 F.2d 1299, 1304 (4th Cir. 1987); *Capital Investors Co. v. Executors of Morrison's Estate*, 584 U.S. 652, 654 (4th Cir. 1978); *see also United States v. Lentz*, 384 F.Supp.2d 934, 938 (E.D.Va. 2005). Thus it is settled that "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts

should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson*, 486 U.S. at 817 (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). Moreover, "application and force of the law of the case doctrine varies significantly depending on whether the subject ruling was rendered by a parallel trial court, or instead by an appellate or superior court." *Lentz*, 384 F.Supp.2d at 938.

In this case, the decision at issue was rendered by a parallel trial court, rather than an appellate or superior court, and accordingly the law of the case doctrine applies with less force in this instance. Even so, reconsideration of the Illinois district court's rulings is inappropriate under the law of the case doctrine unless those rulings are clearly erroneous. And where, as here, reconsideration is sought on a subject matter jurisdiction issue, determination of the jurisdictional issue is both appropriate and necessary. Fed. R. Civ. P. 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998) (noting a court's duty to inquire, *sua sponte*, whether a valid basis for jurisdiction exists).

**B.**

It is axiomatic that a party seeking to establish standing in the federal courts must demonstrate an injury in fact, *i.e.*, she must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A party must therefore allege facts creating a plausible inference that an injury in fact has occurred. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964–65 (2007) ("[A] plaintiff's obligation to provide

the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . . . Factual

allegations must be enough to raise a right to relief above the speculative level."). This plaintiffs

have failed to do.

The complaint is deficient in its factual allegations relating to standing. Apart from the

conclusory allegation in paragraph 41, to the effect that "[b]y the acts alleged herein, SWIFT's

conduct proximately caused harm to Plaintiffs and class members," the complaint fails to allege <u>facts</u>

from which injury in fact may be inferred. For example, although the complaint adequately alleges

that SWIFT disclosed information regarding certain financial transactions, there is no allegation that

plaintiffs' bank or banks are members of SWIFT, nor is there any information indicating that

plaintiffs' financial information was disclosed by SWIFT. Plaintiffs rely on their own belief that

their financial information has been disclosed, but such a belief, without more, cannot support

standing. This point is well illustrated by the recent Sixth Circuit decision in *ACLU v. Nat'l Security*

*Agency*, 493 F.3d 644 (6th Cir. 2007), which held that a plaintiff's own assessment of injury in fact

is insufficient to establish standing. 493 F.3d at 673–74 ("[I]t would be unprecedented for this court

to find standing for plaintiffs to litigate a Fourth Amendment cause of action without any evidence

that the plaintiffs themselves have been subjected to an illegal search or seizure."). The complaint

fails to identify plaintiffs' bank or banks, fails to establish whether such bank or banks are members

of SWIFT, and fails to allege any facts giving rise to a plausible inference that plaintiffs' financial

information was disclosed by SWIFT.

It may be that these omissions can easily be remedied. Plaintiffs certainly know the identity

of their banks and presumably can readily determine whether those banks' transactions are handled

by SWIFT.[10]  127 S.Ct. at 1974.   Plaintiffs would "nudge their claims across the line from the

conceivable to the plausible" were they (i) to allege the identity of the banks or financial institutions

they used, (ii) to conduct a reasonable inquiry to determine whether these banks were members of

SWIFT, and (iii) to conduct a reasonable inquiry to determine whether SWIFT disclosed the named

banks' transactions.  *Bell Atlantic*, 127 S.Ct. at 1974.  In this respect it seems at least plausible that

plaintiffs' banks know or can ascertain from SWIFT whether data they provided to SWIFT was later

disclosed by SWIFT.

The complaint fails to allege facts sufficient to demonstrate the constitutionally required

injury in fact standing requirement.[11]  Accordingly, it is appropriate to dismiss the complaint without

prejudice and to permit the plaintiffs to file an amended complaint alleging additional facts to

support standing.  Plaintiffs need not establish standing to a certainty; they must only allege facts that

---

[10]The Third Amended Complaint alleges that plaintiff Kruse is a customer of TCF Bank which was a member of SWIFT prior to January 2001.  For the reasons discussed above, the Third Amended Complaint is not at issue here.  In any event, plaintiff Kruse's allegations were made only in the context of his state law claims and were not incorporated by reference into plaintiffs' federal claims.  Because a party must demonstrate standing as to every claim, plaintiff Kruse's allegations would be insufficient to establish an injury in fact as to plaintiffs' federal claims even if the Third Amended Complaint were at issue.  *DaimlerChrysler Corp. v. Cuno*, 126 S.Ct. 1854, 1858 (2006).

It is telling that, given the opportunity to plead the identity of his bank, plaintiff Kruse identified a bank that is not currently a member of SWIFT.

[11]Because plaintiffs lack standing to pursue their own claims, it follows, of course, that they are not, at this time, qualified to serve as class representatives.  *Central Wesleyan College v. W. R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) ("[I]t is essential that named class representatives demonstrate standing through a 'requisite case or controversy between themselves personally and [defendants],' not merely allege that 'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'") (citations omitted).

make standing plausible rather than merely conceivable. *Bell Atlantic*, 127 S.Ct. at 1974.[12]

An appropriate order will issue.

Alexandria, Virginia                                   _____/s/_____
October 18, 2007                                       T. S. Ellis, III
                                                       United States District Judge

_____

    [12]It remains open to SWIFT, of course, to establish that plaintiffs' financial information was not disclosed, and that plaintiffs therefore cannot make the necessary showing.